UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:24-CV-00033-GNS-HBB

7D HOLDINGS, LLC PLAINTIFF

v.

JAWK HOLDINGS LLC et al. DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Plaintiff's Motion to Exclude the Expert Testimony of Dr. Scott Hakala (DN 82), Plaintiff's Motion to Exclude the Expert Testimony of Brian M. Sowers (DN 85), Plaintiff's Motion for Partial Summary Judgment (DN 86), Defendants' Motion for Partial Summary Judgment (DN 81), and Plaintiff's Motions for Leave to Seal (DN 83, 87, 92, 100, 103). These motions are ripe for adjudication.

## I. STATEMENT OF FACTS AND CLAIMS

This is a trademark dispute between businesses in the vaping industry. Plaintiff 7D Holdings, LLC ("7D") owns the rights to three federally registered trademarks: DAZE, 7 DAZE, and SEVEN DAYS.[1] (Compl. Ex. A, DN 1-1 [hereinafter Reg. 919]; Compl. Ex. B, DN 1-2 [hereinafter Reg. 543]; Compl. Ex. C, DN 1-3 [hereinafter Reg. 544]). 7D's DAZE mark, pictured below, and its DAZE and SEVEN DAZE marks, which both appear in standard characters,[2] apply to apparel and e-liquids. (Reg. No. 919; Reg. 543; Reg. 544).

[1] 7 Daze, LLC, assigned these marks to 7D Holdings, LLC, which now licenses the marks back to 7 Daze, LLC. (Lau Dep. Excerpts 125:14-127:18, July 28, 2025, DN 88).

[2] "Every application and registration must include a 'drawing' of the mark, which is a clear, easily reproducible depiction of the mark. The drawing informs the world exactly what the registered mark looks like. If the mark consists of standard letters or numbers without a claim to

(Reg. 919). 7D has also applied to register the following mark.

(Compl. Ex. D, DN 1-4 [hereinafter Application 988]).

7D has been using these marks since 2014 to identify its e-liquid products.[3] (Reg. No. 919; Reg. 543; Reg. 544).







any particular font, size or color, a 'standard character' drawing is used." 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 19:58 (5th ed. 2026).

[3] E-liquids "usually contain[] nicotine derived from tobacco, as well as flavorings, propylene glycol, vegetable glycerin, and other ingredients." *E-Cigarettes, Vapes, and Other Electronic Nicotine Delivery Systems (ENDS)*, U.S. Food & Drug Admin., https://www.fda.gov/tobacco-products/products-ingredients-components/e-cigarettes-vapes-and-other-electronic-nicotine-delivery-systems-ends [https://perma.cc/T8CA-CK4P] (last visited July 1, 2026). Electronic nicotine delivery systems, commonly referred to as vapes or e-cigarettes, heat e-liquid "to create an aerosol that is inhaled." *Id.*

(Compl. Ex. H, at 3, 7, DN 1-8).[4] In 2023, 7D began selling hemp[5]-derived products under the brand name GRDNT through its licensee 1 Week Distribution, LLC, using its marks to identify 7 DAZE MFG as the source of the products. (Lau Dep. Excerpts 138:18-140:21, DN 88).




(Defs.' Resp. Pl.'s Mot. Partial Summ. J. Ex. J, DN 96-12).

Defendants Allen Huang ("Huang") and Jonathan Knarreborg ("Knarreborg") own and/or operate several companies—including Defendants AG Science Solutions, Inc. dba Shyne Labs; A to J Group, LLC; GenRev Labs, LLC; and Jawk Holdings, LLC (collectively,

[4] Many images of the parties' products are included in the record. The Court has inserted only a few representative images into this opinion.

[5] As stated by the U.S. Department of Agriculture:

> While hemp and medical marijuana come from the same genus plant and contain many of the same chemical compounds, the concentration of compounds in the two plant species can be vastly different. The legal difference is the amount of Tetrahydrocannabinol (THC) the plant contains. If the cannabis plant contains more than 0.3% THC it is considered marijuana.

*Frequently Asked Questions*, U.S. Dep't of Agric., https://www.ams.usda.gov/rules-regulations/hemp/frequently-asked-questions-faq [https://perma.cc/649F-5HKD] (last accessed July 1, 2026). "THC is the component that produces the 'high' associated with marijuana use." *What You Need to Know (and What We're Working to Find Out) About Products Containing Cannabis or Cannabis-derived Compounds, Including CBD*, U.S. Food & Drug Admin., https://www.fda.gov/consumers/consumer-updates/what-you-need-know-and-what-were-working-find-out-about-products-containing-cannabis-or-cannabis [https://perma.cc/84RS-V5WD] (last accessed July 1, 2026).

"Defendants")—involved in the manufacture of hemp products. (Am. Compl. ¶¶ 11-22; Answer ¶¶ 11-22, DN 62). Defendants began using the name "DazeD8" in 2020. (Pl.'s Mot. Partial Summ. J. Ex. L, at 6, DN 86-13).




(Compl. Ex. H, at 8). Defendants also sometimes use the DazeD mark with no "8," as shown below. (Knarreborg Dep. Excerpts 199:3-15, June 25, 2025, DN 91-4).

DazeD

(Compl. Ex. F, at 4, DN 1-6). In 2023, Defendants began to sell nicotine products, including vapes branded as DazeD Bar. (Huang Dep. Excerpts 101:3-14, June 24, 2025, DN 88-1).




(Compl. Ex. H, at 3).

7D's principal and sole member, John Lau ("Lau"), first learned about Defendants at a trade show in 2022. (Lau Dep. Excerpts 142:13-143:14, DN 88). In his deposition, Lau testified that he heard customers confuse 7D with Defendants' DazeD8 brand. (Lau Dep. Excerpts 142:13-158:13, DN 88). 7D sent Defendants two cease and desist letters before filing the present action. (Compl. Ex. I, DN 1-9; Compl. Ex. J, DN 1-10).

7D sued Defendants for trademark infringement, unfair competition, and cyberpiracy under federal law, and unfair competition under Kentucky common law. (Am. Compl. ¶¶ 70-95). Defendants filed counterclaims seeking a declaration of non-infringement, the cancellation of trademark registration No. 5424919, and refusal of trademark application No. 90756988. (Answer ¶¶ 111-132). Both parties now move for partial summary judgement, and 7D moves to exclude Defendants' experts and seal documents. (Defs.' Mot. Partial Summ. J., DN 81; Pl.'s Mot. Partial Summ. J., DN 86; Pl.'s Mot. Exclude Hakala, DN 82; Pl.'s Mot. Exclude Sowers, DN 85; Pl.'s Mot. Seal, DN 83; Pl.'s Mot. Seal, DN 87; Pl.'s Mot. Seal, DN 92; Pl.'s Mot. Seal, DN 100; Pl.'s Mot. Seal, DN 103).

## II. JURISDICTION

This Court has subject-matter jurisdiction of this matter based upon federal question jurisdiction. *See* 28 U.S.C. § 1331. In addition, the Court has supplemental jurisdiction over the state law claims. *See* 28 U.S.C. § 1367(a).

## III. DISCUSSION

### A. Expert Testimony

Fed. R. Evid. 702 governs expert witness testimony and provides that an expert's opinion is admissible if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The trial court must act as a gatekeeper to ensure that expert testimony is both relevant and reliable, as required by Fed. R. Evid. 104 and 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Conwood Co. v. U.S. Tobacco Co., L.P.*, 290 F.3d 768, 792 (6th. Cir. 2002) (citation omitted). "It is the proponent of the testimony that must establish its admissibility by a preponderance of proof[,]" but "[a]ny doubts regarding the admissibility . . . should be resolved in favor of admissibility." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10); *In re: E. I. Du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 337 F. Supp. 3d 728, 739 (S.D. Ohio 2015) (citing Fed. R. Evid. 702 advisory committee's note to 2000 amendments). "[R]ejection of expert testimony is the exception rather than the rule[,]" as "[t]he Court's gatekeeping role does not supplant the traditional adversarial system and the jury's role in weighing evidence." Fed. R. Evid. 702 advisory committee's note to 2000 amendments; *Certain Underwriters at Lloyd's v. Morrow*, No. 1:16-CV-00180-GNS-HBB, 2019 WL 3558177, at *8 (W.D. Ky. Aug. 5, 2019) (citing *Rogers v. Detroit Edison Co.*, 328 F. Supp. 2d 687, 691 (E.D. Mich. 2004)); *Stotts v. Heckler & Koch, Inc.*, 299 F. Supp. 2d 814, 819 (W.D. Tenn. 2004). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).[6]

---

[6] "[T]he critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology," are questions of admissibility. Fed. R. Evid. 702 advisory committee's notes to 2023 amendments. Still, "[s]ome challenges to expert testimony will raise matters of weight rather than admissibility . . . . [O]nce the court has found it more likely than not that the

The Court's role is to examine "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) (citation omitted). "Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592 (internal citation omitted) (citations omitted). "Presumably, this relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.* (internal quotation marks omitted) (internal citation omitted). Still, the "liberal interpretation of this requirement 'does not mean that a witness is an expert simply because he claims to be.'" *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (citation omitted).

When determining the reliability of an expert's testimony, a key is "whether the reasoning or methodology underlying the testimony is scientifically valid . . . ." *Daubert*, 509 U.S. at 592-93. The Supreme Court has advised, however, that the inquiry is flexible and that "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595. Though there is no definitive checklist for determining whether an expert's testimony is reliable, *Daubert* outlines a non-exhaustive list of factors for courts to consider: (1) whether the theory or method in question "can be (and has been) tested"; (2) whether it "has been subjected to peer review and publication"; (3) whether it has a "known or potential rate of error"; and (4) whether the theory or technique enjoys "general acceptance" in the "relevant scientific community . . . ." *Id.* at 593-94 (citation omitted).

---

admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence." *Id.*

Where a party challenges the testimony of a proffered expert for insufficient factual basis, data, principles, methods, or their application, "the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (alteration in original) (quoting *Daubert*, 509 U.S. at 592). *Daubert* involves balancing the desire to admit relevant evidence liberally against the necessity of excluding misrepresentative "junk science." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176-77 (6th Cir. 2009) (citation omitted). Ultimately, "the trial judge . . . ha[s] considerable leeway in deciding . . . whether particular expert testimony is reliable." *Kumho Tire Co.*, 526 U.S. at 152; *Conwood Co.*, 290 F.3d at 792; *see Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671-72 (6th Cir. 2010) ("Rule 702, we recognize, does not require anything approaching absolute certainty. And where one person sees speculation, we acknowledge, another may see knowledge, which is why the district court enjoys broad discretion over where to draw the line." (internal citation omitted) (citation omitted)).

The Sixth Circuit has noted "[r]ed flags that caution against certifying an expert[,]" such as "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (citation omitted); *see also Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999) ("We have held that a district court is required to rule out 'subjective belief or unsupported speculation' by considering 'whether the testimony has been subjected to the scientific method." (citation omitted)); *Scientific Method*, Black's Law Dictionary (11th ed. 2019) ("The process of generating hypotheses and testing them through experimentation, publication, and replication."). Ultimately, it is the proponent's burden to establish that its proffered experts' theories are "reliable and adequately supported by sound technical data,

methodology and testing." *Berry v. Crown Equip. Corp.*, 108 F. Supp. 2d 743, 754 (E.D. Mich. 2000) (citation omitted).

Expert testimony must also satisfy the evidentiary rules that apply to all testimony—i.e., the testimony must be relevant and not unfairly prejudicial. *See Mutafis v. Markel*, No. 2:11-CV-13345, 2013 WL 119464, at *4 (E.D. Mich. Jan. 9, 2013). Evidence is relevant if it "has any tendency to make a fact of consequence in determining the action more or less probable," with the phrase "any tendency" indicating an "extremely liberal" standard. *Frye v. CSX Transp., Inc.*, 933 F.3d 591, 598-99 (6th Cir. 2019); *see Cambio Health Sols., LLC v. Reardon*, 234 F. App'x 331, 338 (6th Cir. 2007) ("The Federal Rules of Evidence set a low bar for relevance." (citation omitted)). "[A] piece of evidence does not need to carry a party's evidentiary burden in order to be relevant; it simply has to advance the ball." *Dortch v. Fowler*, 588 F.3d 396, 401 (6th Cir. 2009). Relevant evidence is generally admissible, subject to other evidentiary rules. *See* Fed. R. Evid. 402.

Evidence may be excluded if its probative value is substantially outweighed by the risk of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needless cumulative evidence. Fed. R. Evid. 403. "In order to exclude evidence under Rule 403, it must be more than damaging to the adverse party; it must be *unfairly* prejudicial." *Koloda v. Gen. Motors Parts Div., Gen. Motors Corp.*, 716 F.2d 373, 378 (6th Cir. 1983). Evidence is viewed "in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect[,]" and "[t]he test is strongly weighted toward admission." *United States v. Perry*, 438 F.3d 642, 648 (6th Cir. 2006) (internal quotation marks omitted) (quoting *United States v. Zipkin*, 729 F.2d 384, 389 (6th Cir. 1984)); *United States v. Asher*, 910 F.3d 854, 860 (6th Cir. 2018).

### 1. *Plaintiff's Motion to Exclude Hakala (DN 82)*

Defendants proffer Dr. Scott D. Hakala ("Dr. Hakala") as an expert on financial analysis and business valuation. (Defs.' Resp. Pl.'s Mots. Exclude 9, DN 94). 7D moves to exclude Dr. Hakala's report and testimony under Fed. R. Evid. 702, 703, and 403. (Pl.'s Mot. Exclude Hakala 1-2).

#### a. Qualifications as a Trademark Expert

7D argues that Dr. Hakala is not qualified as a trademark or consumer perception expert. (Pl.'s Mem. Supp. Mot. Exclude Hakala 13-14, DN 82-1; Pl.'s Reply Mot. Exclude Hakala 2-3, DN 99). In a footnote, Defendants concede that Dr. Hakala has not been designated as an expert to opine on the likelihood of confusion or genericness of 7D's marks. (Defs.' Resp. Pl.'s Mots. Exclude 7 n.3). Defendants then assert that they will not solicit testimony from him on these matters; rather, Dr. Hakala's "testimony will be limited to matters relating to damages, and specifically to rebut the testimony of Ms. Decker," 7D's expert witness. (Defs.' Resp. Pl.'s Mots. Exclude 7 n.3).

While likelihood of confusion and genericness are the foci of 7D's challenge to Dr. Hakala's qualifications, 7D also argues that Dr. Hakala has "fundamental misunderstandings of trademark principles and their application to infringement analyses due to his lack of qualifications, expertise, or specialized knowledge in the relevant fields," so "his testimony regarding trademark issues, including his opinions on [the experts'] surveys, should be excluded . . . ." (Pl.'s Mot. Exclude Hakala 19). Moreover, 7D specifically claims that "Dr. Hakala's criticisms of Ms. Decker's use of the *Georgia-Pacific* framework for determining a reasonable royalty also belies his misunderstanding of trademark damages analyses." (Pl.'s Mot.

Exclude Hakala 18 (referencing the factors set out in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)).

Thus, Defendants' assertion that "Plaintiff does not challenge Dr. Hakala's expert qualifications to testify regarding the somewhat slim basis for Ms. Decker's opinion" is inaccurate. (Defs.' Resp. Pl.'s Mots. Exclude 27). Because Defendants do not address 7D's arguments about Dr. Hakala's lack of qualifications to testify regarding trademark issues generally or in the context of damages, those arguments are waived. *Induction Therapies, LLC v. Ingenes, LLC*, No. 3:20-CV-382-DJH, 2021 WL 1535374, at *2 (W.D. Ky. Mar. 9, 2021) ("A party waives opposition to an argument by failing to address it in [a] responsive brief." (citation omitted)); *Banuchi v. City of Homestead*, 606 F. Supp. 3d 1262, 1285 (S.D. Fla. 2022) (excluding expert testimony after proponent failed to address opposing party's argument). Therefore, Dr. Hakala may not testify to any matter requiring specialized knowledge of trademarks.

**b. Parroting Huang's Opinions**

7D argues that Dr. Hakala's opinions concerning Defendants' sales revenue and expenses simply "parrot" Huang's opinions. (Pl.'s Mot. Exclude Hakala 6). "Where an expert merely offers his client's opinion as his own, that opinion may be excluded." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 510 (6th Cir. 2014). An expert's "wholesale adoption of [a party's] estimates, without revealing or apparently even evaluating the bases for those estimates, goes beyond relying on facts or data and instead cloaks unexamined assumptions in the authority of expert analysis." *Id.* Experts may, however, rely on data supplied by their clients when forming their opinions. *Auto Konnect, LLC v. BMW of N. Am., LLC*, 590 F. Supp. 3d 977, 986 (E.D. Mich. 2022) ("It was permissible for [the expert] to rely on the data supplied

by [the client]. Defendant's arguments go to the weight of this evidence rather than its admissibility because as long as there is some support in the record for the data relied upon, an expert's testimony is reliable." (citation omitted)).

In this instance, though 7D asserts that Dr. Hakala's opinion that Decker's report is "problematic" is based "solely" on his conversations with Huang, Dr. Hakala stated that he also "look[ed] at the financials" to come to this conclusion. (Pl.'s Mot. Exclude Hakala 8; Hakala Dep. Excerpts 63:5-17, Dec. 15, 2025, DN 84-3). In his report, Dr. Hakala asserts that "[t]he relevant sales are substantially less than presented in [Decker's] report," and discusses the relevant market—which he will not be permitted to opine on at trial, as discussed above—sales realized, and the invoice amounts attributable to Dazed Bar and DazeD8 products. (Hakala Report 3-4, DN 84-2).

Regarding sales realized, Dr. Hakala acknowledges that there are issues with Defendants' records; in some cases, there was an invoice for a product in Defendants' system, but Huang told him it had never been shipped. (Hakala Dep. Excerpts 58:12-59:24, DN 84-3). Dr. Hakala's report states:

> Furthermore, the sales are overstated due to the fact that many of the identified products were ordered, shipped, and/or invoiced but returned or not paid for. Net sales are substantially lower than the sales reported in the Decker Report. *I estimate that only about 80% of the sales reported*, as summarized in Schedule B, from 2022 through the first half of 2025, *were collected or realized*. This translates into estimated revenues of about $34.16 million during that period from 2022 through the first half of 2025 plus an additional $4.60 million in realized sales of DazeD products in 2021.

(Hakala Report 4 (emphasis added)). When asked if it was *his* estimate that only 80% of sales were realized, Dr. Hakala said it was Huang's estimate, "but there is [sic] numbers to support that." (Hakala Dep. Excerpts 75:19-76:5, DN 84-3). Dr. Hakala explains that for one year, invoices indicate that Defendants' net sales were around $17 million, while tax returns indicate

net sales were only around $14 million. (Hakala Dep. Excerpts 76:4-8, DN 84-3). The Court understands Dr. Hakala to imply that this $3 million difference consists of unrealized sales, so only $14 million out of $17 million, or approximately 82% of sales, was realized for that year. Because Dr. Hakala evaluated the basis for Huang's estimate, he may testify regarding that estimate, subject to cross-examination. *See Ask Chems.*, 593 F. App'x at 510.

Dr. Hakala also stated in his report:

> The only product in the listed category for the Plaintiff's trademarks is the Dazed Bar product, which was discontinued in 2024 due to low sales volume. Estimated invoiced amounts have been only at approximately $1.274 million in 2023 and $85,030 in 2024, *according to Mr. Huang*. . . . While not nicotine products, the DazeD8 products related to cartridges and disposables based on invoices were about 70% of invoiced amounts in 2021, 63% of invoiced amounts in 2022, 38% of invoiced amounts in 2023, 10.8% of invoiced amounts in 2024, and 8.0% of invoiced amounts in the first half of 2025 *according to Mr. Huang*. Overall, DazeD8 cartridges and disposables represented about 29% of cumulative invoiced amounts *estimated by Mr. Huang*.

(Hakala Report 4 (emphasis added)). Dr. Hakala confirmed that Huang was his source for these percentages and that he did not check any supporting documentation for these figures. (Hakala Dep. Excerpts 85:3-13, DN 84-3). Defendants have not provided any evidence showing that Dr. Hakala independently verified this data, so he will not be permitted to testify regarding section 5(d) and 5(e) of his report. *See Gott v. Neuman & Esser USA, Inc.*, No. 1:19-CV-4, 2020 WL 7014222, at *5 (E.D. Tenn. Aug. 14, 2020) ("Because Plaintiffs' proposed testimony merely restates, without independent analysis, the findings of others, it cannot be said that [the expert's] 'specialized knowledge will help the trier of fact' or that [the expert] 'has reliably applied' any 'principles and methods to the facts of the case.'" (quoting Fed. R. Evid. 702(a), (d)) (citing *Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268, 275 (E.D. La. 2014)); *U.S. ex rel. Dekort v. Integrated Coast Guard Sys.*, No. 3:06-CV-1792-O, 2010 WL 8367619, at *4 (N.D. Tex. Oct. 8, 2010) (concluding that allowing proposed expert testimony would be "improper and

prejudicial" when the expert merely repeated information that had been presented to him and that he had made no attempt to verify, as well as noting that the evidence could "easily be introduced through the testimony of fact witnesses and materials obtained during discovery").

Dr. Hakala's report also notes that "*Mr. Huang confirmed* that the gross margins for the DazeD8 product line have experienced declines due to competition, shifting market preferences and trends, product returns, and bad debts." (Hakala Report 5 (emphasis added)). Dr. Hakala testified that, based on his conversation with Huang, it was his "understanding" that "the e-cig business is not profitable," though he concedes "there's no way to certify that . . . ." (Hakala Dep. Excerpts 55:12-56:6). Again, this is simply Huang's own opinion, and Dr. Hakala will not be allowed to parrot Huang.

7D raises several other challenges based on the information that Dr. Hakala was provided. Dr. Hakala reviewed the Defendants' general ledgers but testified that he did not review any supporting documentation, relying on Huang to answer his questions.[7] (Hakala Dep. Excerpts 37:11-19, DN 84-3). Huang also provided Dr. Hakala with a list of product sales, which Dr. Hakala believed was based on invoices.[8] (Hakala Dep. Excerpts 135:10-136:3, DN

---

[7] 7D emphasizes that on the day before Dr. Hakala produced his report, Huang provided him with a sales summary that allegedly conflicts with data Huang had previously provided. (Pl.'s Mot. Exclude Hakala 8 (citing Hakala Dep. Excerpts 139:12-21, DN 84-3)). Dr. Hakala stated that he did not attempt to reconcile the two sets of data, but the import of that admission is unascertainable as 7D did not provide the Court with evidence that the data conflicted and to what extent. (Hakala Dep. Excerpts 139:11-140:4, DN 84-3). In its reply, 7D also asserts that this summary was not disclosed before the applicable deadline and should therefore be inadmissible; however, "[i]t is well-settled that a movant cannot raise new issues for the first time in a reply brief because consideration of such issues 'deprives the non-moving party of its opportunity to address the new arguments.'" *Malin v. JPMorgan*, 860 F. Supp. 2d 574, 577 (E.D. Tenn. 2012) (citation omitted); (Pl.'s Reply Mot. Exclude Hakala 9).

[8] Dr. Hakala testified that he did not remember looking at sales revenue by month and by product, but he thought that Huang provided him with "some kind of summary based on invoices." (Hakala Dep. Excerpts 38:19-39:4, DN 84-3). The first time he remembers seeing

84-3). 7D frames that as an admission that Dr. Hakala "did not know what sources Huang's listings were based on," but that characterization is inaccurate. (Pl.'s Mot. Exclude Hakala 8). Dr. Hakala may rely on information provided by Defendants, and the accuracy of that information may be attacked on cross examination. *See Jackson v. E-Z-GO Div. of Textron, Inc.*, 326 F. Supp. 3d 375, 429 (W.D. Ky. 2018) ("[The expert] can testify as to these opinions; however, whether the evidence upon which [the expert] relied led him to opinions that are *accurate* is a matter to be left for cross-examination at trial.").

Dr. Hakala does not recall seeing expenses for streaming services that were billed to the business. (Hakala Dep. Excerpts 86:4-13, DN 84-3). Defendants argue that "Plaintiff's counsel [did not] present him with evidence that any such personal charges had been recorded as business expenses during the relevant period or that they were in any way material," but it is unclear why that would be necessary, as Defendants produced the general ledgers reflecting the personal expenses which Dr. Hakala listed among documents that he relied upon in making his report. (Defs.' Resp. Pl.'s Mots. Exclude 26; Pl.'s Reply Mot. Exclude Hakala 7; Ledger Excerpts, DN 101-1; Hakala Report 41). Dr. Hakala testified that he would typically normalize subscriptions for streaming services out. (Hakala Dep. Excerpt 86:4-13, DN 84-3). Regardless, Dr. Hakala did not believe it was necessary to look at bank or credit card statements to normalize out any improper expenses here because he relied on Defendants' tax returns and "cleaned up" financial statements. (Hakala Dep. Excerpts 89:7-17, DN 84-3). This belief may be attacked on cross examination.

7D also asserts that Dr. Hakala admitted he did not know which products were branded with the marks at issue, but the portion of his deposition cited by 7D does not support that

---

detailed information from the invoices was from Decker's supplemental report. (Hakala Dep. Excerpts 39:2-16, DN 84-3). 7D does not make clear the import of this admission.

assertion. (Pl.'s Mot. Exclude Hakala 8 (citing Hakala Dep. Excerpts 65:1-25, DN 84-3 (discussing relevant market))). Dr. Hakala did, however, admit that he did not know whether the DazeD mark was present on any given product, but that it was represented to him that the Dazed name was not prominent on certain products. (Hakala Dep. Excerpts 138:8-14, DN 138). Dr. Hakala is permitted to draw conclusions on the assumption that certain products do or do not have the infringing mark; this assumption may be probed on cross examination.

7D also emphasizes that Dr. Hakala was limited to the information Defendants provided, though he wanted more detail about Defendants' revenue and collections. (Hakala Dep. Excerpts 40:19-41:8, DN 84-3). While this may limit the weight given to Dr. Hakala's opinion, it does not preclude its admissibility. Additionally, although Dr. Hakala did not know that Huang was a named defendant and did not know that Huang testified that he had no personal knowledge of the companies' profits or profit margins, it is unclear what Dr. Hakala would have done differently if he had that knowledge. (Hakala Dep. Excerpts 20:24-21:9, 62:22-62:6, DN 84-3). Dr. Hakala knew that Huang was the employee of a defendant and thus already had reason to be skeptical of the information provided. (Hakala Dep. Excerpts 20:24-21:2, DN 84-3). Regardless, experts are permitted to rely on information given to them by their clients. *Auto Konnect*, 590 F. Supp. 3d at 986. Accordingly, 7D's motion is granted in part and denied in part.

**2. *Plaintiff's Motion to Exclude Sowers (DN 85)***

Defendants hired Brian M. Sowers ("Sowers") as a consumer perception expert to design surveys that test the likelihood of consumer confusion. (Sowers Report ¶ 9). Sowers conducted two surveys: the "Hemp Confusion Survey" and the "E-Liquid Confusion Survey." (Sowers Report ¶ 9). 7D argues that Sowers' survey methodology was unreliable. (Pl.'s Mem. Supp. Mot. Exclude Sowers 1, DN 85-1). 7D alleges that the surveys contain the following flaws: (a)

both surveys used an improper survey universe; (b) respondents to the Hemp Confusion Survey should have been required to view 7D's DAZE mark; (c) the Hemp Confusion Survey contained excessive distractions; (d) the E-Liquids Confusion Survey improperly used an Eveready format; (e) an answer to a question in the E-Liquids Confusion Survey was not properly coded as indicative of confusion; (f) no respondents in either survey were exposed to 7D's DAZE mark as a primary brand product. (Pl.'s Mem. Supp. Mot. Exclude Sowers 6).

**a. Survey Universe**

7D alleges that Sowers used an improper universe[9] for both surveys. (Pl.'s Mem. Supp. Mot. Exclude Sowers 7). Addressing a similar issue, a sister court recognized:

> Courts consider the selection of the proper universe as one of the most important factors in assessing the validity of a survey as well as the weight that it should receive. Selection of a proper universe is so critical that even if the proper questions are asked, the results are likely to be irrelevant. In a trademark infringement case such as this, where the plaintiff alleges that the defendant's mark causes consumers of the defendant's products to mistakenly believe that the defendant's products are from the same source as, or are connected with, the plaintiff's products, the proper universe is the potential purchasers of the defendant's, i.e., the junior user's, products.

*Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 452 F. Supp. 2d 772, 781-82 (W.D. Mich. 2006) (internal quotation marks omitted) (internal citations omitted), *aff'd*, 502 F.3d 504 (6th Cir. 2007). Still, a survey universe may be technically incorrect yet admissible:

> If the survey universe is sufficiently close to the "correct" universe, it can be regarded as a technical defect, allowed into evidence but given less weight than it would be otherwise entitled. But if the universe selected is significantly skewed away from the proper group of people whose perception is at issue, it may be excluded from evidence altogether.

[9] "In scientific parlance, a 'universe' (sometimes also called a 'population') is defined as the totality of all individuals (or elements) possessing a particular trait or feature in common." Jacob Jacoby & Amy H. Handlin, *Non-Probability Sampling Designs for Litigation Surveys*, 81 Trademark Rep. 169, 170 (1991).

McCarthy, *supra*, § 32:159; *see Bacarella v. Prime Hydration, LLC.*, No. 0:24-CV-61376, 2025 WL 3688742, at *9 (S.D. Fla. Nov. 18, 2025) (admitting survey where there was no "flagrant methodological error"). So, "[e]ven if a survey does not target what the court considers to be the optimal universe, the results may be so compelling that it still supports the factual finding for which it was intended." McCarthy, *supra*, § 32:162. The deciding factor is whether "the reactions of the universe surveyed are irrelevant to the perceptions of the correct universe." *Id.* "An over- or underinclusive universe will make a survey inadmissible only when the universe is so unrepresentative that the survey loses its probative value entirely." *Navarro v. Procter & Gamble Co.*, 501 F. Supp. 3d 482, 499 (S.D. Ohio 2020) (citation omitted); *Deckers Outdoor Corp. v. Last Brand, Inc.*, No. 23-CV-04850-AMO, 2025 WL 2822682, at *3 (N.D. Cal. Oct. 2, 2025) ("[C]ourts generally leave the job of determining the significance of a survey's under or over-inclusivity to the jury . . . ." (citation omitted)).

In this instance, Sowers defined the survey universe as "potential customers of THC based products." (Sowers Report ¶¶ 19, 74). Respondents qualified for participation in either survey if they: (1) were "21 or older"; (2) were "likely to purchase THC based products in the next six months"; and (3) had "at least some input in selecting which THC based product to purchase." (Sowers Report ¶ 22). Regarding the second element, respondents were asked which products they would be likely to purchase in the next six months, and the answer that participants needed to select to qualify was worded as follows: "THC based product (e.g., dab pen, cartridge, edibles, gummies)." (Sowers Report ¶ 34).

7D asserts that this universe is both over- and underinclusive. (Pl.'s Mem. Supp. Mot. Exclude Sowers 7-9). First, 7D argues that "THC based products" is an ambiguous term that covers a wide range of products that are not sold by Defendants. (Pl.'s Mem. Supp. Mot.

Exclude Sowers 7). 7D states that none of the parties sell marijuana in any form, only products derived from hemp, and there are many hemp-based products that no party sells, such as beverages and lotions. (Pl.'s Mem. Supp. Mot. Exclude Sowers 7-8). Indeed, in response to an interrogatory, Defendants listed all their products connected with any of the DAZED marks: non-disposable vaping cartridges, disposable vaping cartridges, gummies, tinctures, vaping concentrates, CBD flowers, and prerolled hemp cigarettes. (Pl.'s Reply Mot. Exclude Sowers Ex. B, at 2, DN 102-2)). Second, although 7D and Defendants have both sold nicotine vapes, respondents were not asked about nicotine usage or purchases. (Pl.'s Mem. Supp. Mot. Exclude Sowers 8).

Defendants claim that 7D provides no support for its assertion that screening for THC users was flawed because no party sells marijuana. (Defs.' Resp. Pl.'s Mots. Exclude 14). 7D's expert, Dr. Joseph Maronick, believed it was improper to screen for THC because THC is predominantly associated with marijuana, but this opinion was based on conversations with 7D's counsel, rather than any expertise of his own. (Maronick Dep. 22:11-23:2, Jan. 12, 2026, DN 94-5). While the predominance of THC's association with marijuana is unclear from the record, it is true that THC may be derived from hemp or marijuana, and the surveys do not cull people who might buy marijuana-derived THC but not hemp-derived THC,[10] though it is unclear how

[10] As stated by the U.S. Department of Agriculture:

> While hemp and medical marijuana come from the same genus plant and contain many of the same chemical compounds, the concentration of compounds in the two plant species can be vastly different. The legal difference is the amount of Tetrahydrocannabinol (THC) the plant contains. If the cannabis plant contains more than 0.3% THC it is considered marijuana.

*Frequently Asked Questions*, U.S. Dep't of Agric., https://www.ams.usda.gov/rules-regulations/hemp/frequently-asked-questions-faq [https://perma.cc/649F-5HKD] (last accessed July 1, 2026).

many consumers hold that preference. More troublesome for Defendants is the possibility that the survey universe included respondents who might be likely to buy THC based beverages or lotions, as these would fall under the category of "THC based products," but would not buy any of Defendants' products, such as a vape. To this, Defendants offer no counterargument. Again, though, there is no indication whether these respondents make up a significant portion of the survey universe.

Defendants also assert that 7D ignores its own definition of Defendants' products in its Amended Complaint: "Defendants are engaged in the manufacturing, distribution and sale of vaping devices and products which are vaped, smoked, or ingested, including e-liquids and products containing various levels and *formulations of tetrahydrocannabinol (THC) (collectively 'Defendants' Products')*." (Defs.' Resp. Pl.'s Mots. Exclude 13-14 (quoting Am. Compl. ¶ 42 (emphasis added))). The parties parse this sentence differently: Defendants seem to read the phrase "containing various levels and formulations of tetrahydrocannabinol (THC)" as modifying both "e-liquids and products," meaning Defendants' e-liquids and products both contain THC, while 7D interprets that phrase as only modifying "products," meaning Defendants sell both (1) e-liquids that do not contain THC and (2) products that do contain THC. (Defs.' Resp. Pl.'s Mots. Exclude 13-14; Pl.'s Reply Mot. Exclude Sowers 4).

Defendants' interpretation is unreasonable, as e-liquids are commonly understood to contain nicotine.[11] Additionally, in its Amended Complaint, 7D clearly conceptualizes its products as belonging to two separate categories: (1) "Plaintiff's E-Liquid Products," which

---

[11] *See, e.g.*, *E-liquid*, Dictionary.com, https://www.dictionary.com/browse/e-liquid [https://perma.cc/X8UX-4QZM] ("the fluid that is turned into vapor in an e-cigarette or the like, usually containing nicotine, water, and propylene glycol or glycerol, and sometimes flavorings") (last visited July 1, 2026); *E-liquid*, Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/eliquid [https://perma.cc/MVN5-FUA8] ("the liquid that is used in an e-cigarette or similar device") (last visited July 1, 2026).

includes "e-liquids and vaping devices for e-liquids," and (2) "Plaintiff's Hemp Products," which includes "products derived from hemp as well as devices for vaping hemp derived products." (Am. Compl. ¶¶ 23-24). The Amended Complaint also clearly encompasses Defendants' nicotine products: 7D argued that the DazeD Bar mark, used in connection with Defendants' nicotine vapes, infringes on its trademarks; 7D attached photos of Defendants' Dazed Bar nicotine products; and 7D discussed Jawk's application for a trademark for "DAZED BAR in connection with *electronic devices for the inhalation of nicotine-containing aerosols*." (Am. Compl. ¶¶ 40, 48, 64; Compl. Ex. E, DN 1-5; Compl. Ex. F; Compl. Ex. K, DN 1-11). Because the appropriate survey universe is potential purchasers of Defendants' products, that universe—at least for the E-Liquid Confusion Survey—should include potential purchasers of Defendants' nicotine products, who may not be THC users.[12]

Accordingly, 7D's contention that the survey universes are both over- and under-inclusive is correct. The survey universes, however, are not so far off that the surveys have no probative value. Sowers' testimony will not be excluded and 7D may probe the survey flaws on cross examination.

**b. Use of DAZE Mark in Hemp Survey**

7D argues that the Hemp Confusion Survey respondents should have been required to view the DAZE mark. (Pl.'s Mem. Supp. Mot. Exclude Sowers 9). The Hemp Confusion Survey compared 7D's GRDNT branded hemp vape with Defendants' DAZED branded hemp vape. (Sowers Report ¶¶ 41, 48). On the back of the GRDNT product packaging, 7 DAZE MFG is identified as the source of the product. (Sowers Report ¶ 42). Respondents were shown the

[12] Defendants also point to Sowers' assertion that Defendants market advertise their products as "THC products" on their websites. (Defs.' Resp. Pl.'s Mots. Exclude 14 (citing Sowers Dep. 17:12-19, Dec. 17, 2025, DN 85-3)). Even if true, this does not change the fact that Defendants have sold nicotine products, which 7D alleges infringed on its trademark.

front of the packaging, while images of the back and sides of the packages and front and back images of the actual product were shown in thumbnails and available for optional viewing. (Sower Report ¶ 42). Respondents received the following instruction:

> You may zoom in on the image in the main window by hovering your mouse over the image on a desktop or laptop, by double tapping the image on a smartphone, or by tapping and holding on tablet. If you choose to do so, you may switch between different views of the product by clicking on the thumbnail images.

(Sower Report ¶ 43). Below are screenshots from the survey that show 7D's and Defendants' products.




(Sowers Report App. D, at D-8).




(Sowers Report App. D, at D-14).

7D argues that the survey should not have used GRDNT as a comparator; instead, a DAZE branded product should have been used. (Pl.'s Mem. Supp. Mot. Exclude Sowers 10-11). While the results of the survey are only indicative of confusion between the parties' hemp-based

products, that limitation is not a reason for exclusion. After all, it is Defendants' theory that the hemp- and nicotine-based products are not competitively proximate. (Defs.' Resp. Pl.'s Mots. Exclude 16-17). 7D on the other hand, believes that these products are competitively proximate, and 7D may therefore argue that the Hemp Confusion Survey has little weight at trial. (Pl.'s Mem. Supp. Mot. Exclude Sowers 10-11).

Next, 7D asserts that GRDNT should have been promoted as GRDNT by 7 DAZE in order to replicate market conditions and respondents should have been required to view the DAZE mark on the back of the GRDNT packaging. (Pl.'s Mem. Supp. Mot. Exclude Sowers 9-10). Defendants respond that the survey is consistent with market conditions because consumers would only see the front of the packages on the shelf unless they chose to pick up the product. (Defs.' Resp. Pl.'s Mots. Exclude 18). As Sowers testified, "had we forced them to look at the back of the product, that is not how it is -- you don't put the back of the product up on the shelf." (Sowers Dep. Excerpts 60:22-61:1, DN 85-3). Indeed, 7D's expert explained that 7D's own survey only showed the front of packaging "[b]ecause usually the focus as in this case, the focus is what's on the front of the package and that's what consumers are making decisions based off." (Maronick Dep. Excerpts 45:17-24). Thus, according to both experts, this is not a flaw in the survey.

**c. Excessive Distractions in Hemp Survey**

7D challenges the format of the Hemp Confusion survey. (Pl.'s Mem. Supp. Mot. Exclude Sowers 12). The Hemp Confusion Survey's design was adapted from the "Squirt" format. (Sowers Report ¶ 26).

> The "Squirt" format presents a survey respondent with both of the conflicting marks. It does not assume that the respondent is familiar with the senior mark. The method of telling the respondent what the senior mark is can be either direct or subtle. A direct method is to ask in some fashion if the respondent thinks that

> goods or services bearing the parties' marks A and B are from the same source or different sources.

McCarthy, *supra*, § 32:174.50. Additionally, respondents are commonly shown other products or asked questions that are not relevant to the results of the survey:

> In any survey where both plaintiff and defendant's marks are to be sequentially presented to respondents, it is suggested that the presentation not be temporally contiguous, but separated by the insertion of "distracter" questions or activities designed to occupy the respondent's attention for at least 10 to 15 seconds. Scholarly research indicates that having respondents distracted for five to ten seconds is sufficient to remove contents from immediate or short-term memory, although not long-term memory.

1 Jacob Jacoby, *Trademark Surveys: Designing, Implementing, and Evaluating Surveys*, 545-546 (2013).

In the Hemp Confusion Survey, after being shown 7D's product, respondents were asked a series of distractor questions:

> Respondents were asked how often they watch television (Q1), to provide one or two of their favorite television programs (Q2), what television programs they watched recently that they did not like (Q3), and if in the past six months they had read any books (Q4). Respondents who answered "No" or "Don't know/Unsure" to Q4 skipped over Q5. If respondents selected "Yes" in Q4, they were asked what one or two books they enjoyed reading the most (Q5).

(Sowers Report ¶ 46). Respondents were then shown Defendants' DazeD branded product[13] and two other THC products in a random order. (Sowers Report ¶ 48). After each product, respondents were asked a series of questions to measure their beliefs about the connection between 7D's product and these products. (Sowers Report ¶ 50). Respondents answer nine likelihood-of-confusion questions after each product, so respondents will answer either five,

[13] If the respondents were in the test group, they were shown photos of the Dazed product. (Sowers Report ¶¶ 47-48). If the respondents were in the control group, they were shown photos with the mark "Fuddled" instead of "Dazed." (Sowers Report ¶ 48).

fourteen, or twenty-three intervening questions in total. (Pl.'s Mem. Supp. Mot. Exclude Sowers 13).

7D argues that the excessive number of distractor questions removed respondents' perception of 7D's product from their short-term memory. (Pl.'s Mem. Supp. Mot. Exclude Sowers 12). 7D believes that "this defeats the whole purpose of a Squirt survey, which is to test confusion among marks that are not top-of-mind, but that may nonetheless be confused with a competitor's mark because both marks are encountered within a short time." (Pl.'s Mem. Supp. Mot. Exclude Sowers 12). 7D cites Swann, who makes a distinction between marks that are "*internally accessible* in memory," which are tested by an Eveready survey, and "those that are *externally available* in the marketplace," which are tested by a Squirt survey. Jerre B. Swann, *Likelihood-of-Confusion Surveys*, Trademark and Deceptive Advertising Surveys: Law, Science, and Design 67 (2d ed. 2022). 7D also argues that the distractor questions' impact is strengthened by the fact that the "Room Two" images are displayed "sequentially rather than in an array," as is traditionally done in a Squirt survey. (Pl.'s Mem. Supp. Mot. Exclude Sowers 13).

Defendants respond that the goal of the surveys is to test respondents' long-term, not short-term, memory. (Defs.' Resp. Pl.'s Mots. Exclude 19). Sowers testified:

> [I]f you're saying that the short-term memory is relevant and that the long-term memory is not, what that suggests is the confusion can only happen if I see them within two seconds of one another. By that logic, what you're saying is if I see your product today and defendants' product tomorrow, I can't be confused because it's out of my short-term memory. That is not what we are testing. That is not where the likely confusion is. So per the literature I cite to in my report, you're supposed to include these distractor questions to remove from short term, but not long-term memory what they see.

(Sowers Dep. Excerpts 64:15-65:5, DN 85-3). Sowers did measure how long respondents spent answering the distractor questions but estimated that respondents should not have taken more

than 30 to 60 seconds. (Sowers Dep. Excerpts 65:10-17, DN 85-3). Sowers also apparently also testified that "the sequential format is the preferred method."[14]

Professor Jacoby, cited by 7D for a different proposition, states that respondents should be distracted for "*at least* 10 to 15 seconds." Jacoby, *supra*, 545-546 (emphasis added). 7D does not point to any authority establishing a time limit for effective distractor questions or stating that a sequential format is improper for a Squirt survey. Sowers' testimony will therefore not be excluded on this basis.

**d. Use of Eveready Format in E-Liquids Survey**

Without any citation to authority, 7D argues that the Eveready format "is only proper when the senior user's mark is sufficiently well known in the general public such that it can be named in an unaided 'top of mind' response.'" (Pl.'s Mem. Supp. Mot. Exclude Sowers 13). According to Professor McCarthy:

> While commentator Swann argued that an *Eveready* type of survey is appropriate only if the senior mark is well-known and "top-of-mind," the courts have rejected such a restriction on use of an *Eveready* survey. Poret ran a series of test surveys and they supported the position that an *Eveready* survey "may be appropriate for senior marks that are *not* top-of-mind." Based on this evidence, Poret concluded that "the issue of whether a senior mark is top-of-mind is not, on its own, a suitable metric for assessing whether an *Eveready* survey is appropriate."

---

[14] Defendants quote Sowers' deposition, providing the following citation: "Sowers Dep., Ex. 6, at 54:20 – 55:7." (Defs.' Resp. Pl.'s Mots. Exclude 20). These pages are not included in either party's excerpts of Sowers' deposition, so the accuracy of the quotation cannot be verified. (*See* Sowers Dep. Excerpts, DN 85-3; Sowers Dep. Excerpts, Dec. 17, 2025, DN 94-6). Swann provides some support for this proposition:

> Since absolute processing results in fewer false positives and greater overall accuracy, it would be preferable for marks in a Squirt line-up to be presented to respondents one at a time to promote absolute processing. Consumers, however, rarely (if ever) see marks one at a time and I have not encountered a decision insisting on sequential displays to enhance the accuracy of Squirt methodology results.

Jerre B. Swann, *A History of the Evolution of Likelihood of Confusion Methodologies*, 113 Trademark Rep. 723, 761 (2023) (footnote omitted).

McCarthy, *supra*, § 32:174 (footnotes omitted). It is therefore not at all clear that the Eveready format was inappropriate for the E-Liquid Confusion Survey.

**e. "DAZED" Response in E-Liquids Survey**

7D argues that its customers "often do not distinguish between the present tense DAZE or the past tense DAZED," so when "respondents for [the E-Liquid Confusion Survey] stated that the Defendants' product was put out by "DAZED[,]" they could have been referring to Defendant or 7D. (Pl.'s Mem. Supp. Mot. Exclude Sowers 14). 7D asserts that Sowers did not code these responses as confused or otherwise account for that possibility. (Pl.'s Mem. Supp. Mot. Exclude Sowers 14). When Sowers was asked if there was any way of telling whether respondents who answered "Dazed" were actually thinking about 7D, Sowers replied in the affirmative:

> There is. You have to look at the responses across the respondent and not just for one particular question. So one of those is to ask—the next question is what other brands or products are put out by the company that puts this out. So you can look at that question for one to see if anybody mentions anything—if they mention nicotine products or something like that, I might be conservative and give that to plaintiff which is what I did here. Or you can look across to see if there is anything in any of the opening responses and suggest they are thinking about Daze and not Dazed. And I think if they are saying Dazed, what you're seeing in that data why do you say that because that is what it says on the package. So there is no evidence they are thinking about the plaintiff, but where there was ambiguity, I gave that to plaintiff to be conservative.

(Sowers Dep. Excerpts 91:20-92:22, DN 85-3). Thus, 7D's assertion that Sowers did nothing to account for possible confusion is inaccurate. If 7D finds Sowers' response insufficient, they may attack it on cross examination.

**f. Exposure to DAZE as a Primary Brand**

Finally, 7D argues that the survey respondents were never exposed to any DAZE products where DAZE was the primary brand on the front of the packaging: in the Hemp Confusion Survey, respondents were shown GRDNT by 7 DAZE, and in the E-Liquid Confusion

Survey, respondents were only shown Defendant's DAZED hemp vape. (Pl.'s Mem. Supp. Mot. Exclude Sowers 14). 7D's argument regarding the use of the GRDNT mark in the Hemp Confusion Survey is addressed above, and 7D provides no authority explaining why 7D's mark should have been shown in the E-Liquid Confusion Survey, which utilized an Eveready format. McCarthy, *supra*, § 32:174 ("[T]he "Eveready" survey format does not inform survey respondents what the senior mark is, but assumes that they are aware of the mark from their prior experience."). 7D does not explain why the fact that no respondents were ever exposed to DAZE as a primary brand renders the surveys unreliable, so Sowers' testimony will not be excluded on that basis.

### B. Summary Judgment

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of stating the basis for the motion and identifying the evidence demonstrating an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party satisfies its burden, the nonmoving party must then produce specific evidence proving the existence of a genuine dispute of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable for the nonmoving party, the nonmoving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). Rather, the nonmoving party must present facts proving that a genuine factual dispute exists by "citing to particular parts of materials in the record" or by

"showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient" to overcome summary judgment. *Anderson*, 477 U.S. at 252.

**1. *Plaintiff's Motion (DN 86)***

**a. Defendant's Counterclaim**

In their second counterclaim, Defendants assert that Trademark Registration No. 5424919 should be cancelled. (Answer Am. Compl ¶¶ 114-122, DN 62). 7D argues that it is entitled to summary judgment on this counterclaim.[15] (Pl.'s Corrected Mem. Supp. Mot. Partial Summ. J. 10, DN 91-2).

First, 7D avers that, as a matter of law, its trademarks are incontestable and cannot be canceled on the grounds of ornamentality or failure-to-function. (Pl.'s Corrected Mem. Supp. Mot. Partial Summ. J. 10). "[A]fter five consecutive years of continuous use and the satisfaction of certain formalities, Lanham Act § 15, 15 U.S.C.A. § 1065 provides that the 'right of the registrant to use' the registered mark on the registered goods or services shall be 'incontestable.'" McCarthy, *supra*, § 32:141. An incontestable "registration shall be conclusive evidence of the validity of the registered mark"—yet incontestability is subject to various exceptions. *Id.* §§ 32:141, 32:147.

Defendants concede that the mark is incontestable. (Defs.' Resp. Pl.'s Mot. Partial Summ. J. 26). Defendants do not address 7D's arguments about ornamentality or failure-to-function and focus instead on the argument that "daze" has become generic. (Defs.' Resp. Pl.'s

[15] 7D also briefly discusses its pending trademark application; to the extent that it seeks to dismiss Counterclaim Three, Refusal of Trademark Application No. 90756988, that motion will be denied for the same reasons discussed here. (Pl.'s Mem. Supp. Mot. Partial Summ. J. 15; Am. Compl. ¶¶ 123-132).

Mot. Partial Summ. J. 26-28). Indeed, an incontestable mark may be challenged on the basis that it has become generic. *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 405 (6th Cir. 2002) (citing 15 U.S.C. § 1065). "Nevertheless, because the mark at issue was a federally registered mark, there is a presumption that the term is non-generic and the defendant[s] bear[] the burden of overcoming this presumption." *Id.*

The Sixth Circuit described a "generic term" as follows:

> "A generic term is one that is commonly used as the name of a kind of goods. Unlike a trademark, which identifies the source of a product, a generic term merely identifies the genus of which a particular product is a species." If a mark's primary significance is to describe a type of product rather than the producer, it is generic and is not a valid trademark. Thus, the appropriate "test for genericness is whether the [relevant] public perceives the term primarily as the designation of the article." To allow protection for generic terms would grant "a monopoly, since a competitor could not describe his goods as what they are."

*Id.* at 404-05 (internal citations omitted). For example, when deciding whether the term "Booking.com" was generic, the Supreme Court stated:

> [W]hether "Booking.com" is generic turns on whether that term, taken as a whole, signifies to consumers the class of online hotel-reservation services. Thus, if "Booking.com" were generic, we might expect consumers to understand Travelocity—another such service—to be a "Booking.com." We might similarly expect that a consumer, searching for a trusted source of online hotel-reservation services, could ask a frequent traveler to name her favorite "Booking.com" provider. Consumers do not in fact perceive the term "Booking.com" that way, the courts below determined. . . . That should resolve this case: Because "Booking.com" is not a generic name to consumers, it is not generic.

*U.S. Pat. & Trademark Off. v. Booking.com B. V.*, 591 U.S. 549, 557 (2020). Thus, a commonly used phrase or motif is not necessarily generic. "[E]vidence of the relevant public's understanding of a term 'may be obtained from *any competent source*[,]'" including "dictionary definitions, newspapers and other publications, generic use by competitors, generic use of the term by the mark's owners, and use of the term by third parties in trademark registrations." *Nartron Corp.*, 305 F.3d at 406.

Defendants argue that 7D has the burden to present proof of non-genericness. (Defs.' Resp. Pl.'s Mot. Partial Summ. J. 27). While 7D has the ultimate burden to prove there is no dispute of material fact in order to obtain summary judgment, it is Defendants' burden to produce evidence of genericness, as 7D's incontestable mark is presumed to be non-generic. *Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 415 (6th Cir. 2010) ("McGill works to show that the plaintiffs' evidence—previous judicial rulings, survey evidence, expert testimony—does not establish nongenericness by a preponderance of the evidence, but this approach gets the burden of persuasion backwards.").

The Defendants' own opinion about whether "dazed" is generic "does not provide an objective appraisal of the public's view . . . ." *McGill*, 617 F.3d at 416. Defendants, however, also assert that "the record reflects wide third-party use of 'DAZE,' 'DAZED,' and similar terms across vaping and related industries . . . ." (Defs.' Resp. Pl.'s Mot. Partial Summ. J. 27; Defs.' Resp. Pl.'s Mot. Partial Summ. J. Ex. A, DN 96-3; Defs.' Resp. Pl.'s Mot. Partial Summ. J. Ex. B, DN 96-4). A factfinder may rely on third-party evidence when determining genericness. *Gibson, Inc. v. Armadillo Distrib. Enters., Inc.*, 107 F.4th 441, 447 (5th Cir. 2024), *as revised* (Aug. 8, 2024) ("Third-party-use evidence, or evidence demonstrating an alleged trademark's usage by parties other than the alleged infringer or rightsholder, is often relevant to show the genericness of a mark." (citation omitted)).[16]

---

[16] 7D argues that "[n]one of this evidence goes to the issue of whether DAZE is the generic name for a product. There is simply no evidence that DAZE is the common name for vaping products or any hemp- or nicotine-derived products." (Pl.'s Reply Mot. Partial Summ. J. 15, DN 105). While evidence of third-party use may indicate that a mark is generic, 7D asserts that third-party use *alone* is insufficient to overcome a presumption genericness. (Pl.'s Corrected Mem. Supp. Mot. Partial Summ. J. 14). In support of that proposition, 7D cites *McGill*, which states:

> McGill's argument for genericness is that "Seventh-day Adventist" describes a religion, but he offers scant evidence that *the public* perceives the term as

"Whether a mark is generic is a question of fact . . . ." *T. Marzetti Co. v. Roskam Baking Co.,* 680 F.3d 629, 633 (6th Cir. 2012); *Int'l Watchman, Inc. v. Nato Strap Co.*, 62 F. Supp. 3d 674, 680-81 (N.D. Ohio 2014) ("Here, defendants' evidence is insufficient to establish genericness as a matter of law. Plaintiff's evidence, together with the presumption that exists in favor of nongenericness is sufficient to create an issue of fact."). 7D has not shown that they are entitled to summary judgment as a matter of law, so its motion will be denied as to Defendants' counterclaims.

**b. Likelihood of Confusion**

Next, 7D seeks partial summary judgment on its trademark infringement claim. "A party proves trademark infringement by showing (1) that it owns a trademark, (2) that the infringer used the mark in commerce without authorization, and (3) that the use of the alleged infringing trademark 'is likely to cause confusion among consumers regarding the origin of the goods offered by the parties.'" *AWGI, LLC v. Atlas Trucking Co.*, 998 F.3d 258, 264 (6th Cir. 2021) (quoting *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 502 (6th Cir. 2013)). 7D specifically requests summary judgment on the third element, likelihood of confusion.

When deciding the likelihood of confusion, courts consider the following eight factors:

---

> referring to a particular set of beliefs rather than to the plaintiffs' church. . . . [T]he existence of the breakaway churches does little to help McGill. As the district court wrote, "[i]f anything, the fact that the Defendant can point to *only two other splinter groups* founded in the last century that bear the name supports the conclusion that members of the relevant public would generally associate the term with the churches affiliated with the General Conference." *McGill*, 624 F. Supp. 2d at 894.

*McGill*, 617 F.3d at 415-16 (emphasis added). The Sixth Circuit took issue with the *number* of third-party users, not that the only relevant evidence was third-party use, as 7D claims. 7D provides no other authority to support their assertion that evidence of third-party use alone is insufficient to prove genericness as a matter of law.

> (1) strength of the plaintiff's mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines or services.

*Id.* (citing *Kibler v. Hall*, 843 F.3d 1068, 1073 (6th Cir. 2016)). "A party claiming infringement need not show all, or even most, of these factors in order to prevail." *Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1242 (6th Cir. 1991) (citing *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir. 1988)).

The existence of likelihood of confusion is a mixed question of fact and law, so "[f]actual findings must be made with respect to the likelihood of confusion factors set out above[,] . . . [but] the further determination of whether a given set of foundational facts establishes a likelihood of confusion is a legal conclusion." *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991). "To resist summary judgment in a case where the likelihood of confusion is the dispositive issue, a nonmoving party must establish . . . that there are genuine factual disputes concerning those . . . factors which may be material in the context of the specific case." *Id.* at 1107. In other words, Defendants must "identify a disputed factor or set of factors whose resolution would necessarily be dispositive on the likelihood of confusion issue." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 646 (6th Cir. 2002) (quoting *Mktg. Displays, Inc. v. TrafFix Devices, Inc.*, 200 F.3d 929, 934 (6th Cir. 1999), *rev'd on other grounds*, 532 U.S. 23 (2001)).

**i. Strength of the Mark**

"The strength of a mark is a factual determination of the mark's distinctiveness. The more distinct a mark, the more likely is the confusion resulting from its infringement, and, therefore, the more protection it is due." *Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1985). "A mark is strong and distinctive when 'the public readily accepts it as the

hallmark of a particular source;' such acceptance can occur when the mark is unique, when it has received intensive advertisement, or both." *Bliss Collection, LLC v. Latham Cos.*, 82 F.4th 499, 509 (6th Cir. 2023) (quoting *Daddy's Junky Music Stores, Inc. v. Big Daddy's Fam. Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997)). Incontestable marks are entitled to a presumption of strength. *Progressive Distrib. Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 429 (6th Cir. 2017).

"[T]he strength evaluation encompasses two separate components: "(1) 'conceptual strength,' or 'placement of the mark on the spectrum of marks,' which encapsulates the question of inherent distinctiveness; and (2) 'commercial strength' or 'the marketplace recognition value of the mark.'" *Id.* (quoting *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 419 (6th Cir. 2012)). The Sixth Circuit described conceptual strength as follows:

> A mark's distinctiveness and resulting conceptual strength "depends partly upon which of four categories it occupies: generic, descriptive, suggestive, and fanciful or arbitrary." A descriptive mark "specifically describes a characteristic or ingredient of an article," while an arbitrary mark "has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached, such as CAMEL cigarettes or APPLE computers." *Id.* (internal quotation marks and brackets omitted). "A descriptive mark, by itself, is not protectable." However, a "merely descriptive term can, by acquiring a secondary meaning, *i.e.,* becoming distinctive of the applicant's goods, become a valid trademark."

*Progressive*, 856 F.3d at 428 (internal citations omitted).

7D claims that its mark is fanciful or arbitrary, while Defendants claim that it is generic. (Pl.'s Corrected Mem. Supp. Mot. Partial Summ. J. 17-18; Defs.' Resp. Pl.'s Mot. Partial Summ. J. 13-14). As stated above, 7D has not carried its burden on summary judgment regarding Defendants' claims of genericness.

"Because the strength of a trademark for purposes of the likelihood-of-confusion analysis depends on the interplay between conceptual and commercial strength, the existence of inherent

distinctiveness is not the end of the inquiry." *Maker's Mark*, 679 F.3d at 419 (citation omitted). "A mark's commercial strength depends on public recognition, or the extent to which people associate the mark with the product it announces." *Progressive*, 856 F.3d at 430 (citing *Maker's Mark*, 679 F.3d at 419). Additionally, proof of marketing may support a finding that the mark is commercially strong, and proof of extensive use of the mark or a similar mark in the relevant market may support a finding that the mark is commercially weak.[17] *Id.*; *Maker's Mark*, 679 F.3d at 420 (citations omitted) (a mark may be "substantially weaken[ed]" by "extensive third-party uses").

7D alleges that it "spends millions annually on marketing and promoting" its marks, pointing to Lau's testimony that 7D spends anywhere from $33,000 to $2 million per year on advertising. (Pl.'s Corrected Mem. Supp. Mot. Partial Summ. J. 18; Pl.'s Reply Mot. Partial Summ. J. 8; Lau Dep. Excerpts 51:17-24, DN 88). Defendants, on the other hand, assert that extensive third-party use of the term "daze" has weakened 7D's marks. (Defs.' Resp. Pl.'s Mot. Partial Summ. J. 15). Defendants point to many uses of the term "daze" online and in trademark applications in relation to products and shops in the industry. (Defs.' Resp. Pl.'s Mot. Partial Summ. J. 15; Defs.' Resp. Pl.'s Mot. Partial Summ. J. Ex. A; Defs.' Resp. Pl.'s Mot. Partial Summ. J. Ex. B). Moreover, in response to a USPTO action, 7D argues that "[t]here are multiple third-party registrants using 'DAZE' . . . ," citing to three specific examples. (Defs.' Resp. Pl.'s Mot. Partial Summ. J. Ex. H, at 4, DN 96-10). Because a reasonable jury could find in favor of Defendants on this subfactor, this factor cannot be resolved on summary judgment.

[17] While survey evidence is the most persuasive evidence of commercial recognition, it is not a requirement. *Id.* In this instance, neither party provides survey evidence.

**ii. Relatedness of the Goods**

To determine whether goods are related, a court must place them into one of three categories: direct competition, where "confusion is likely if the marks are sufficiently similar"; "somewhat related but not competitive," where "the likelihood of confusion will turn on other factors"; or "totally unrelated," where "confusion is unlikely." *Daddy's*, 109 F.3d at 282. The Sixth Circuit has explained:

> Services and goods "are 'related' not because they coexist in the same broad industry, but are 'related' if the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company."

*Id.* at 282-83 (quoting *Homeowners*, 931 F.2d at 1109).

7D's nicotine products and Defendants' hemp products are likely somewhat related.[18] Regardless, 7D and Defendants have, at least at some point, both sold hemp and nicotine products, and the parties' respective nicotine and hemp products clearly compete with each other. (Huang Dep. Excerpts 101:3-14, DN 88-1; Lau Dep. Excerpts 138:18-140:21, DN 88). This factor therefore favors 7D.

**iii. Similarity of the Marks**

"The more similar the marks are, the more likely it is that relevant consumers will confuse their sources." *Kibler*, 843 F.3d at 1077. Courts determine similarity by considering "whether either mark would confuse a consumer who did not have both marks before her and had only a vague impression of the other mark." *Id.* (citing *Daddy's*, 109 F.3d at 283). Courts analyze the marks' pronunciation, appearance, and verbal translation. *Id.* "The anti-dissection

[18] Defendants argue that because 7D argued to the USPTO that there was minimal overlap between smoking tobacco and nicotine e-liquid, it cannot now argue that there is overlap between nicotine e-liquid and hemp products. (Defs.' Resp. Pl.'s Mot. Partial Summ. J. 17-18). Defendants' point is noted, but these contentions are not necessarily incompatible.

rule requires us not to dwell on the prominent features of a mark and instead consider it as a whole." *Id.* (citing *Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571-72 (6th Cir. 1987)).

7D alleges that Defendants' use of the designations DazeD, DazeD8, DazeD Bar, and other variations violate 7D's marks: DAZE, 7 DAZE, and SEVEN DAZE. (Am. Compl. ¶ 1). 7D's DAZE mark is described as follows:

> The mark consists of THE WORD "DAZE" IN ALL CAPS, OUTLINED IN BLACK COLOR, WITH THE LETTER "Z" MADE OF TWO "7""S, THE FIRST "7" IS IN BLUE COLOR, AND THE SECOND IS REVERSED AND UPSIDE DOWN. EACH CHARACTER EXCEPT THE FIRST "7" IS IN WHITE COLOR WITH BLACK OUTLINING.

(Reg. 919).



(Reg. 919). On the other hand, the marks "7 DAZE" and "SEVEN DAZE" "CONSIST[] OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR." (Reg. 543; Reg. 544).

Both parties' marks reference numerals, with 7D using "7" and Defendants using "8," though sometimes 7D incorporates the "7" into "DAZED" and Defendants use "Dazed" without any numeral. (Reg. 919; Knarreborg Dep. Excerpts 199:3-15, DN 91-4); *see Daddy's*, 109 F.3d at 283 ("[T]he phrase 'Daddy's' is not merely a *component* of the 'Daddy's' marks: it *is* the marks. The failure to fully consider 'Daddy's' alone was especially detrimental to the extent that defendant presents itself as 'Big Daddy's Music,' 'Big Daddy's,' and 'Big Daddy,' all of which

are more similar to 'Daddy's' than is the full name of defendant." (citing McCarthy, *supra*, § 23.15[8])). 7D's marks evoke the concept of "seven days a week," while Defendants' marks, at least when a numeral is used, refer to Delta 8. 7D uses the present tense "daze," while Defendants use the past tense "dazed." The difference between the meaning and pronunciation, however, of "daze" and "dazed" is minimal.[19]

Visually, the parties' marks are more distinct, as depicted below.




*7 Daze*

7 Daze Ohmlet Disposable Vape - 7000 Puffs

*Dazed*

Dazed Disposable Vape - 6000 Puffs

(Compl. Ex. H, at 3).

[19] Lau has testified that 7D is also referred to as "dazed" in the industry. (Lau Dep. Excerpts 160:22-161:19, DN 88).




Daze ICED E-Liquid Vape Juices




Daze ICED Salt Vape Juice 30ml

(Compl. Ex. H, at 7).




Apple Fritter Dazed Premium HHCO




Daze Delta 8 HHC Disposable 2

(Compl. Ex. H, at 9).[20]

[20] Though not raised by the parties, the Court notes that some of Defendants' products are mislabeled as "Daze" on a third-party website, as seen above.




(Defs.' Resp. Pl.'s Mot. Partial Summ. J. Ex. Q, DN 96-19).[21]

7D's mark utilizes clean, symmetrical lines and consistent blue and black coloring, while Defendants' marks contain curved, more cartoonish lettering and bold colors. Another differentiating feature is Defendant's pyramid logo. Overall, Defendants' marks leave a much more playful, somewhat haphazard impression than 7D's more sterile marks. Additionally, the capitalization of the "D" at the end of "DazeD" makes the one-letter difference more pronounced. Because of these visual differences in particular, a reasonable jury could find that these marks are not very similar. The issue of similarity should therefore not be decided at the summary judgment.

---

[21] There are more depictions of the parties' products in the record. Those included here are examples from exhibits the parties cited in support of their arguments on similarity.

### iv. Evidence of Actual Confusion

Evidence of actual confusion is not required, but it is "undoubtedly the best evidence of likelihood of confusion." *Daddy's*, 109 F.3d at 284 (quoting *Wynn Oil Co.*, 839 F.2d at 1188).

Lau testified that, at a trade show, someone in the industry told Lau and his team that they were just at their booth, which confused Lau until he put it together that they had visited the DazeD8 booth, not 7D's booth. (Lau Dep. Excerpts 142:22-143:4, DN 88). Someone else reached out, possibly because he wanted to "get into the industry," and Lau testified that "he thought Dazed8 was us." (Lau Dep. Excerpts 149:5-151:13, DN 88). Two distributors asked if the DazeD8 brand belonged to 7D. (Lau Dep. Excerpts 151:21-152:5; 152:25-154:9, DN 88). Another industry member asked Lau if they "were Dazed8." (Lau Dep. Excerpts 155:7-156:6, DN 88). Another person messaged Lau "most likely asking if the brand was ours, too." (Lau Dep. Excerpts 156:11-157:16, DN 88). A seller of industry-relevant machinery also reached out to express confusion. (Lau Dep. Excerpts 157: 19-158:13, DN 88). As documentation, 7D also attached the following to their complaint: an email asking if a DazeD8 booth was affiliated with 7D, an email asking about 7D's "new DazeD8 line," and a text saying that "so many people are getting confused with Dazed and 7 Daze." (Compl. Exhibit L, at 1-6, DN 1-12). Lau's team also informed him that three or four stores expressed confusion. (Lau Dep. Excerpts 148:21-149:4, DN 88).

Defendants argue that these statements are hearsay. (Defs.' Resp. Pl.'s Mot. Partial Summ. J. 7-8). "It is well established that a court may not consider hearsay when deciding a summary judgment motion." *Tranter v. Orick*, 460 F. App'x 513, 514 (6th Cir. 2012) (citations omitted). Hearsay is statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted

in the statement." Fed. R. Evid. 801(c). The Federal Rules of Evidence carve out exceptions to the hearsay rule, including:

> A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Fed. R. Evid. 803(c).

"The majority of courts have held either that testimony of plaintiff's employees as to confused customers is not hearsay because it is not offered to prove the truth of any customer's assertion or is admissible under an exception to the hearsay rule." McCarthy, *supra*, § 23:15. Indeed, "[t]he Sixth Circuit holds that such testimony regarding instance in which a potential customer expressed confusion is not inadmissible because it is offered as evidence of confusion rather than for the truth of the matter asserted." *Flower Mfg., LLC v. CareCo, LLC*, 466 F. Supp. 3d 797, 817 n.7 (N.D. Ohio 2020) (citation omitted); *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 738 (6th Cir. 2012) ("First, the strict application of the rules of evidence to a claim that depends on showing customer confusion places too heavy a burden on [the plaintiff]. Should we expect a sworn statement or affidavit from a retailer who calls into a distributor and claims to have been confused? Second, the phone calls were not relied on to show the content of the conversations, but rather were introduced merely to show that the conversations occurred and the state of mind of the declarants."); *Lucky's Detroit, LLC v. Double L, Inc.*, 533 F. App'x 553, 559 n.1 (6th Cir. 2013). "Of course, depending on its form and substance, actual confusion evidence may well constitute inadmissible hearsay, and courts have rejected such evidence where plaintiffs have failed to establish a proper basis for admissibility." Michael J. Allen, *The Role of Actual Confusion Evidence in Federal Trademark Infringement Litigation*, 16 Campbell

L. Rev. 19, 56-57 (1994). Even if not hearsay, however, "anecdotal accounts of confusion, lacking in detail and primarily offered in the form of hearsay at the bench trial," may "lack the details necessary to establish actual confusion" and be "sufficiently few in number that they do little to support [the plaintiff's] claim of actual confusion." *Leelanau*, 502 F.3d at 519.

It is therefore possible that at least some of 7D's evidence of actual confusion may be presented in a non-hearsay format at trial. 7D may need to further explain the basis for admission or find an alternative witness for some of Lau's statements. Take, for example, Lau's statement that *his employees* told him retailers were confused—7D will need to explain why this is not hearsay or put an employee on the stand. Moreover, Lau did not provide much detail about these encounters in his deposition, so their probative value may be limited.

Regardless, the Sixth Circuit has considered survey evidence as evidence of actual confusion. *Leelanau*, 502 F.3d at 519; *see* 4 Callmann on Unfair Competition § 21:9 (4th ed. 2025) ("Some courts consider such surveys to be direct evidence of actual confusion (as a factor in the likelihood of confusion analysis."). The parties present competing surveys, creating a genuine issue of material fact. *Dish Network, LLC v. Fun Dish, Inc.*, 112 F. Supp. 3d 627, 638 (N.D. Ohio 2015) ("These disputes concerning the value of and conclusion drawn from competing expert testimony present genuine issues of fact for a jury to decide. The conclusions concerning the relevant surveys involve witness credibility determinations and factual conclusions reserved for the trier of fact, as it is within the jury's purview to assign weight and value to the competing expert opinion on survey evidence."). Thus, this factor cannot be resolved on summary judgment.

**v. Marketing Channels Used**

The marketing channels factor "consists of considerations of how and to whom the respective goods or services of the parties are sold." *Homeowners*, 931 F.2d at 1110. As the Sixth Circuit explained:

> Obviously, dissimilarities between the predominant customers of a plaintiff's and defendant's goods or services lessens the possibility of confusion, mistake, or deception. Likewise if the services of one party are sold through different marketing media in a different marketing context than those of another seller, the likelihood that either group of buyers will be confused by similar service marks is much lower than if both parties sell their services through the same channels of trade.

*Id.* "Where 'both companies target the same potential customers and utilize many of the same marketing outlets, the marketing channel factor weighs in favor of likelihood of confusion.'" *Omni Assocs., Ltd. v. Omni Com., LLC*, No. CV 5:24-149-DCR, 2025 WL 3687780, at *16 (E.D. Ky. Dec. 18, 2025) (quoting *AutoZone, Inc. v. Tandy Corp.*, 174 F. Supp. 2d 718, 730-31 (M.D. Tenn. 2001)) (citation omitted). "The greater the overlap, the higher the risk of confusion." *Id.*

7D asserts that both parties' products are sold to at least 62 of the same stores and distributors. (Pl.'s Corrected Mem. Supp. Mot. Partial Summ. J. 22-23; Ex. O, DN 88-2). 7D and Defendants both attend trade shows, such as Champs and Total Product Expo, and advertise in trade show publications, such as HQ. (Lau Dep. Excerpts 51:7-16, DN 88; Knarreborg Dep. Excerpts 63:1-4, 197:24-25, DN 91-4; Pl.'s Mot. Summ. J. Ex. M, at 10-11, DN 86-14; Pl.'s Mot. Partial Summ. J. Ex. F, DN 86-7). Both parties sell their products online and use social media. (Compl. Ex. H; Compl. Ex. F; Lau Dep. Excerpts 51:3-6, DN 88; Knarreborg Dep. 61:18-22, DN 91-4).

Defendants argue that the overlapping stores make up a fraction of the nationwide outlets where the parties sell their products and that 7D has provided no evidence that the products are

sold in the same section or shelf. (Defs.' Resp. Pl.'s Mot. Partial Summ. J. 22). Defendants also argue that overlapping sales to distributors are irrelevant and 7D has not shown evidence of any overlapping individual consumers. (Defs.' Resp. Pl.'s Mot. Partial Summ. J. 22-23). Defendants, however, do not cite any authority establishing the legal relevance of these assertions. Defendants also contend that the parties' customer bases are different. (Defs.' Resp. Pl.'s Mot. Partial Summ. J. 22-23). The only evidence Defendants cite in support, however, is Sowers' testimony, which is not based on personal knowledge nor offered as an expert opinion based on his research or survey. Accordingly, this factor weighs in favor of 7D.

**vi. Likely Degree of Purchaser Care**

When considering likely degree of purchaser care, courts usually use the "typical buyer exercising ordinary caution" standard, but "when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard is proper[,]" and confusion is less likely. *Homeowners*, 931 F.2d at 1111. "[C]ourts typically find businesses such as wholesalers, retailers and institutional customers to be 'sophisticated' purchasers and less likely to be confused." *Flower Mfg.*, 466 F. Supp. 3d at 818 (citations omitted). Purchasers are also likely to exhibit less care when the purchase is not "expensive or unusual." *Lucky's*, 533 F. App'x at 559. "For example, home buyers will display a high degree of care when selecting their real estate brokers, whereas consumers of fast-food are unlikely to employ much care during their purchases." *Daddy's*, 109 F.3d at 285 (internal citation omitted) (citation omitted).

7D contends that neither party's products are particularly expensive, but Defendants point to USPTO actions in which 7D characterized its products as expensive. (Pl.'s Corrected Mem. Supp. Mot. Summ. J. 23; Defs.' Resp. Pl.'s Mot. Partial Summ. J. Ex. N, at 5, DN 96-16; Defs.' Resp. Pl.'s Mot. Partial Summ. J. Ex. H, at 7). Listings from one website show that the products

can range in price from $7.50 to $236.25. (Compl. Ex. H). Additionally, 7D does not dispute Defendants' characterization of both parties' sales as predominantly consisting of business-to-business transactions. (Defs.' Resp. Pl.'s Mot. Partial Summ. J. 24; Pl.'s Reply Mot. Partial Summ. J. 13-14). Thus, while this factor likely favors Defendants, the weight of this factor depends on the similarity of the marks. "The effect of purchaser care, although relevant, will be less significant than, or largely dependent upon, the similarity of the marks at issue." *Daddy's*, 109 F.3d at 286. Because there is a genuine question of material fact as to the similarity of the marks, the weight of this factor cannot be determined on summary judgment.

**vii. Defendants' Intent**

"If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity." *Homeowners*, 931 F.2d at 1111. "Intent is relevant because purposeful copying indicates that the alleged infringer, who has at least as much knowledge as the trier of fact regarding the likelihood of confusion, believes that his copying may divert some business from the senior user." *Daddy's*, 109 F.3d at 286 (citation omitted). Circumstantial evidence can be sufficient to support a finding of intent. *See id.* The intent factor may only weigh in 7D's favor; if the evidence shows that Defendants did not intend to confuse consumers, the factor is neutral. *See id.* at 287.

"[T]he mere prior existence of a registered mark [does not] demonstrate[] that the alleged infringer intentionally copied that mark; otherwise, presumably all trademark infringement cases could result in a finding of intentional copying." *Id.* at 286-87. Still, "the use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying. Further, the extensive advertising and long-term use of a protected mark can create a presumption that the alleged infringer knew of the protected mark."

*Daddy's*, 109 F.3d at 286 (internal citations omitted). Additionally, a "failure to exercise diligence before using [a mark]" can also provide circumstantial evidence of adverse intent" because "[i]t is the second user's responsibility to avoid confusion in its choice of a trademark." *AWGI, L.L.C. v. Atlas Trucking Co., L.L.C.*, No. 17-12131, 2020 WL 3546100, at *37 (E.D. Mich. June 30, 2020) (quoting *D&J Master Clean, Inc. v. Servicemaster Co.*, 181 F. Supp. 2d 821, 826 (S.D. Ohio 2002)).

7D began using its DAZE marks in 2014 and obtained federal trademark registrations in 2018 and 2019. (Pl.'s Mot. Partial Summ. J. Ex. B, at 7, DN 86-3; Reg. 919; Reg. 543; Reg. 544). 7D alleges that "Knarreborg and Huang lived in the same city as 7D where it had become known," which Defendants do not dispute.[22] (Pl.'s Corrected Mem. Supp. Mot. Partial Summ. J. 24; *see* Defs.' Resp. Pl.'s Mot. Partial Summ. J.). Knarreborg came up with name DazeD8 in 2020. (Pl.'s Mot. Partial Summ. J. Ex. L, at 6, DN 86-13). He did not perform a trademark search but did look on Google to see if any other companies were using the name. (Knarreborg Dep. Excerpts 38:5-18, DN 91-4).

Knarreborg first learned about 7Daze in 2022. (Knarreborg Dep. Excerpts 106:3-5, DN 91-4). When Defendants looked into trademarking DazeD Bar in 2023, a trademark search report showed four of 7D's marks in the top ten results. (Pl.'s Mot. Partial Summ. J. Ex. P, DN 88-3). Later that year, 7D sent Defendants two cease and desist letters. (Compl. Ex. I; Compl. Ex. J). Knarreborg testified that, after receiving the cease and desist, he called customers to ask if there had been any confusion, and they reported that there was none. (Knarreborg Dep. 109:13-18, June 25, 2025, DN 96-7). In his deposition, when asked what evidence he had that

---

[22] In its statement of facts, 7D asserts that Knarreborg and Huang moved from Los Angeles to Kentucky in 2019. (Pl.'s Mot. Partial Summ. J. 9 (citing Huang Dep. 13:17-14:8; Knarreborg Dep. 21:5-23:10)). The cited portion of Huang's deposition was not attached as an exhibit, and the cited portion of Knarreborg's deposition does not mention Los Angeles.

Defendants intentionally adopted the DazeD8 brand to cause consumer confusion with 7Daze, Lau stated: "I don't believe they [acted] intentionally from the start, but given that we did issue them or made them aware of our brand, and they continued to sell, that's when it became intentional." (Lau Dep. Excerpts 168:4-12, July 28, 2025, DN 96-9).

While there is circumstantial evidence that would support a finding of bad faith, a reasonable jury could find that Defendants acted in good faith, rendering summary judgment on this factor inappropriate. *See Daddy's*, 109 F.3d at 287 ("[T]he record contains sufficient facts to create an issue regarding whether the owner of defendant knew of plaintiff's marks and intentionally patterned the name of defendant after them.").

**viii. Likelihood of Product Line Expansion**

"[A] 'strong possibility' that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Homeowners*, 931 F.2d at 1112 (citation omitted). If neither party presents evidence that it intends to expand its products or services, this factor is neutral. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 639 (6th Cir. 2002). When the parties offer "identical, or at least overlapping" goods or services," this factor is not relevant to the Court's analysis. *AWGI*, 2020 WL 3546100, at *37. Because both parties sell hemp and nicotine products, this factor is neutral.

**ix. Conclusion**

Because several important factors cannot yet be determined, it is inappropriate to make a determination on the likelihood of confusion at this stage. 7D's motion for summary judgement on the likelihood of confusion is therefore denied.

**2. *Defendants' Motion (DN 81)***

Defendants argue that they are entitled to summary judgment on the evidence of actual confusion and intent factors. (Defs.' Mot. Partial Summ. J. 1). As discussed above, there are genuine questions of material fact as to both factors, so Defendants' motion will similarly be denied.

**C. <u>Motions for Leave to Seal</u>**

In ruling on a motion to seal, courts "must balance the litigants' privacy interests against the public's right of access . . . ." *Rudd Equip. Co. v. John Deere Constr. & Forestry Co.*, 834 F.3d 589, 594 (6th Cir. 2016). "The party seeking to seal records has [a] heavy burden" in overcoming the presumption and must show: "(1) a compelling interest in sealing the records; (2) that the interest in sealing outweighs the public's interest in accessing the records; and (3) that the request is narrowly tailored." *Kondash v. Kia Motors Am., Inc.*, 767 F. App'x 635, 637-38 (6th Cir. 2019) (citing *Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 305 (6th Cir. 2016)).

There is a "strong common law presumption in favor of public access to court proceedings and records." *Id.* at 1179. "The public has an interest in ascertaining what evidence and records the District Court . . . ha[s] relied upon in reaching [its] decisions." *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1181 (6th Cir. 1983). "Even when no party objects, the public's right of access remains." *Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas, Inc.*, No. 3:13-CV-82-CRS-CHL, 2017 WL 3220470, at *2 (W.D. Ky. July 28, 2017).

The strong presumption of public access can be overcome when certain interests are at issue, such as "privacy rights of participants or third parties, trade secrets and national security." *Brown & Williamson Tobacco Corp.*, 710 F.2d at 1179. Courts can deny access to court records

that could be used "as sources of business information that might harm a litigant's competitive standing." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978).

**1. *Plaintiff's Motion for Leave to Seal DN 82 (DN 83)***

7D moved to provisionally seal Exhibits A, B, C, D, E, and F of its memorandum of law because the exhibits contain or reference information produced by Defendants under a confidentiality designation. (Pl.'s Mot. Seal 1, DN 83; Pl.'s Mot. Seal Ex. A, DN 65-1). It takes no position on whether a permanent seal is appropriate. (Pl.'s Mot. Seal 1, DN 83). Defendants did not respond to this motion. Because the presumption of public access has not been overcome, this motion is denied.

**2. *Plaintiff's Motion for Leave to Seal DN 86 (DN 87)***

7D moved to provisionally seal Exhibits E and P of its memorandum of law because the exhibits contain or reference information produced by Defendants under a confidentiality designation. (Pl.'s Mot. Seal 1, DN 87; Pl.'s Mot. Seal Ex. A, DN 65-1). It takes no position on whether a permanent seal is appropriate. (Pl.'s Mot. Seal 1, DN 87). Defendants did not respond to this motion. Because the presumption of public access has not been overcome, this portion of the motion is denied.

7D also moves to seal portions of Exhibit A and O. (Pl.'s Mot. Seal 1, DN 87). Exhibit A (DN 88) consists of portions of Lau's deposition transcript, and Exhibit O (DN 88-2) consists of lists of customers. 7D has a compelling interest in sealing these records because they contain its sensitive business information, which consists of customer information and advertising and revenue figures. Our sister court "has repeatedly 'recognized that protecting confidential information that would otherwise allow competitors an inside look at a company's business strategies is a compelling reason to restrict public access to filings.'" *Total Quality Logistics,*

*LLC v. Riffe*, No. 1:19-CV-23, 2020 WL 5849408, at *2 (S.D. Ohio Sep. 30, 2020) (quoting *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, No. 1:11-CV-871, 2017 WL 4168290, at *2 (S.D. Ohio Sep. 20, 2017) (citing *Procter & Gamble Co. v. Ranir, LLC*, No. 1:17-CV-185, 2017 WL 3537195, at *3 (S.D. Ohio Aug. 17, 2017) ("Confidential Information" includes "nonpublic information" that contains "confidential trade secret, technical, business, financial, or personal information"))). "Records containing the names of customers or clients are confidential and potentially appropriate for filing under seal." *Pro. Investigating & Consulting Agency, Inc. v. SOS Sec. LLC*, No. 2:19-CV-3304, 2022 WL 16706688, at *2 (S.D. Ohio Nov. 4, 2022) (citation omitted).

"The lesser the public interest in the litigation's subject matter, the lesser the showing necessary to overcome the presumption of access. . . . [T]he public's interest in this litigation is less than it would be in a case involving constitutional rights, among other things." *Caudill*, 2017 WL 3220470, at *5. Additionally, the "weight to be accorded the public right of access to judicial documents" may be "largely derived from the role those documents played in determining litigants' substantive rights—conduct at the heart of Article III—and from the need for public monitoring of that conduct." *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995); *McPheeters v. United Servs. Auto. Ass'n*, 549 F. Supp. 3d 737, 752 (S.D. Ohio 2021) ("At this juncture, it does not appear that the public will need to review the specific contents of [the sealed exhibits] to understand Plaintiffs' arguments in opposition to the motion for judgment on the pleadings."). In this instance, it is the number of overlapping or confused customers, not the individual customers' identities, that is relevant, and the amount 7D spent on advertising is not dispositive or particularly important in this case. Additionally, "where," as here, "a district court '*denied* the summary judgment motion, essentially postponing a final determination of

substantive legal rights,' the public interest in access 'is not as pressing.'" *Amodeo*, 71 F.3d at 1049 (quoting *In re Reps. Comm. for Freedom of the Press*, 773 F.2d 1325, 1342 n.3 (D.C. Cir. 1985) (Wright, J., concurring in part and dissenting in part)).

Moreover, the request is narrowly tailored: Exhibit O contains only customer information and Exhibit A is sparingly redacted. 7D's motion to maintain these exhibits under seal is therefore granted.

**3. *Plaintiff's Motion for Leave to Seal DN 91 (DN 92)***

7D moved to provisionally seal Exhibit E.1 of its corrected memorandum of law because the exhibit contains or references information produced by Defendants under a confidentiality designation. (Pl.'s Mot. Seal 1, DN 92; Pl.'s Mot. Seal, Ex. A, DN 65-1). It takes no position on whether a permanent seal is appropriate. (Pl.'s Mot. Seal 1, DN 92). Defendants did not respond to this motion. Because the presumption of public access has not been overcome, this portion of the motion is denied.

7D also moves to seal portions of Exhibit A.1 because it contains its sensitive business information. (Pl.'s Mot. Seal 1, DN 92). This exhibit consists of portions of Lau's deposition transcript, with the same categories of redactions as discussed above. (Pl.'s Corrected Mem. Supp. Mot. Partial Summ. J., Ex. A.1, DN 91-3; Ex. A.1, DN 93). This portion of the motion is therefore granted for the same reasons.

**4. *Plaintiff's Motion for Leave to Seal DN 99 (DN 100)***

7D moved to provisionally seal portions of Exhibits A and B of its reply because the exhibits contain or reference information produced by Defendants under a confidentiality designation. (Pl.'s Mot. Seal 1, DN 100; Pl.'s Mot. Seal, Ex. A, DN 65-1). It takes no position on whether a permanent seal is appropriate. (Pl.'s Mot. Seal 1, DN 100). Defendants did not

respond to this motion. Because the presumption of public access has not been overcome, this motion is denied.

#### 5. *Plaintiff's Motion for Leave to Seal DN 102 (DN 103)*

7D moved to provisionally seal portions of Exhibit D of its reply because the exhibit contains or references information produced by Defendants under a confidentiality designation. (Pl.'s Mot. Seal 1, DN 103; Pl.'s Mot. Seal, Ex. A, DN 65-1). It takes no position on whether a permanent seal is appropriate. (Pl.'s Mot. Seal 1, DN 103). Defendants did not respond to this motion. Because the presumption of public access has not been overcome, this motion is denied.

## IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1. Plaintiff's Motion to Exclude the Expert Testimony of Dr. Scott Hakala (DN 82) is **GRANTED IN PART** and **DENIED IN PART**.

2. Plaintiff's Motion to Exclude the Expert Testimony of Brian M. Sowers (DN 85) is **DENIED**.

3. Plaintiff's Motion for Partial Summary Judgment (DN 86) is **DENIED**.

4. Defendants' Motion for Partial Summary Judgment (DN 81) is **DENIED**.

5. Plaintiff's Motion for Leave to Seal DN 82 (DN 83) is **DENIED**. The Clerk is directed to unseal DNs 84, 84-1, 84-2, 84-3, 84-4, and 84-5.

6. Plaintiff's Motion for Leave to Seal DN 86 (DN 87) is **GRANTED IN PART** and **DENIED IN PART**. The Clerk is directed to maintain DNs 88 and 88-2 under seal and unseal DNs 88-1 and 88-3.

7. Plaintiff's Motion for Leave to Seal DN 91 (DN 92) is **GRANTED IN PART** and **DENIED IN PART**. The Clerk is directed to maintain DN 92 under seal and unseal DN 92-1.

8. Plaintiff's Motion for Leave to Seal DN 99 (DN 100) is **DENIED**. The Clerk is directed to unseal DNs 101 and 101-1.

9. Plaintiff's Motion for Leave to Seal DN 102 (DN 103) is **DENIED**. The Clerk is directed to unseal DN 104.



**Greg N. Stivers, Judge**
**United States District Court**
August 14, 2026

cc: counsel of record